287 F.2d 443
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MIDWEST TRANSFER COMPANY OF ILLINOIS, and International
Brotherhood of Teamsters, Chauffeurs, Warehousemen
& Helpers of America, Local 30, Respondents.
 No. 13288.
 United States Court of Appeals Third Circuit.
 Argued Dec. 1, 1960.
Decided Feb. 13, 1961.
 
 Elliott Moore, Washington, D.C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, Allison W. Brown, Jr., Attys., National Labor Relations Board, Washington, D.C., on the brief), for petitioner.
 Helen F. Humphrey, Washington, D.C. (Josephine H. Klein, Philadelphia, Pa., on the brief), for respondent, Midwest Transfer Co. of Ill.
 Ben Paul Jubelirer, Pettsburgh, Pa., for International Brotherhood.
 Before McLAUGHLIN, HASTIE and FORMAN, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 On this petition for enforcement of an order of the National Labor Relations Board we are asked to sustain the Board's conclusion that action of Midwest Transfer Co., an employer, and Local Union No. 30, International Brotherhood of Teamsters, in dischargining and causing the discharge of seven Midwest employees constituted unfair labor practices.
 
 
 2
 Midwest is an interstate common carrier which maintains freight terminals in many places. The employees in question had worked at the Etna, Pennsylvania, terminal, an installation operated under a valid labor contract, containing a union security clause, between Midwest and Teamsters Local No. 249. On February 10, 1958, Midwest closed the Etna terminal and transferred its employees there to a new terminal in Irwin, Pennsylvania. This new location was outside the territorial jurisdiction of Teamsters' Local No. 249 and within the jurisdiction of Teamsters' Local No. 30. Midwest promptly agreed to recognize Local 30 as the representative of its employees in the new plant and entered into an agreement with the union which required the newly transferred employees to join Local 30 by March 3, 1958, on penalty of dismissal. The seven employees of this case failed to comply with that requirement and, accordingly, were discharged on March 3rd, less than thirty days after they began working at the new terminal.
 
 
 3
 The first question in dispute is whether this discrimination against employees who refused to make an immediate change in their union affiliation constituted an unfair labor practice within the meaning of Section 8(a)(3) of the Labor Management Relations Act of 1947, 29 U.S.C.A. 158(a)(3), which reads as follows:
 
 
 4
 '8(a) It shall be an unfair labor practice for an employer-- * * *
 
 
 5
 '(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, * * *'
 
 
 6
 Were it not for the proviso in Section 8(a)(3) the sweeping prohibition at the beginning of paragraph (3) would certainly prohibit discharging a union man for refusing to tranfer from one local to another of the same international union. N.L.R.B. v. Local 542, International Union of Operating Engineers, 3 Cir., 1958, 255 F.2d 703; N.L.R.B. v. International Brotherhood of Boilermakers, etc., District No. 2, 2 Cir., 1956, 232 F.2d 393, certiorari denied 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118. In order to justify its conduct Midwest must show that the discharges in controversy were sanctioned by the proviso. In our view, the proviso validates an employer's 'agreement with a labor organization * * * to require as a condition of employment (to which the agreement shall become applicable) membership therein on or after the thirtieth day following the beginning of such employment * * *.' We have added the bracketed phrase to the proviso in order to make explicit what we think is a necessary implication of the statutory language. For a collective bargaining agreement, in its nature, applies not to employment at large, but to some class or classes of persons employed somewhere by the contracting employer. In the present case the agreement negotiated between Midwest and Local 30 covered teamsters employed by Midwest at the Irwin terminal. In the case of the transferred employees, the 'beginning of such employment' occurred February 10, 1958. Thus, the proviso cannot be read to have sanctioned a requirement that the employees in question join Local 30 before March 12, 1958. This analysis makes the beginning of emplovment by Midwest at some place outside she jurisdiction of Local 30, prior to 'the beginning of such employment' as the statute describes, irrelevant for present purposes.[1]
 
 
 7
 Although counsel have argued the legislative history and objectives of Section 8(a)(3) we find no occasion to resort to these guides. We simply see no reasonable reading of the proviso which would sanction the discriminatory discharge of employees in the circumstances of this case. Thus, the general prohibition at the beginning of the subsection is controlling.
 
 
 8
 An alternative argument of the employer requires separate consideration. It is argued that the arrangement between Midwest and Local 30 was in effect an 'assignment' of the previously existing contract between Midwest and Local 249, with the result that an obligation to join Local 30 on removal to Irwin was in legal contemplation only a continuation of the obligation to maintain union membership in accordance with the original contract. This argument fails because the transaction was not an assignment of a continuing contract to a successor union. Local 249 and Local 30 were separate organizations. In their respective territories they operated under distinct comprehensive labor contracts, negotiated at different times and differing in many details. On the basis of uncontroverted evidence the trial examiner properly found that, in connection with the transfer of operations from Etna to Irwin, Midwest agreed with Local 30 that conditions of work and employment at Irwin should be those described in a contract between Midwest and a union council which included Local 30, but with a proviso that for four months the employees 'will be paid the rate schedules, Health & Welfare and Pension, daily and weekly overtime, and daily and weekly guarantees as are presently established by the Local 249' contract. In addition, the employer and the union agreed that upon removal from Etna to Irwin employees must become members of Local 30. We think the Board was justified in construing this agreement as a new contract in which certain provisions of the old Local 249 contract were temporarily incorporated. Certainly, the requirement to transfer to Local 30, which the employer and the union undertook to impose upon the employees, was something new, substituted for and quite different from the requirement to retain membership in Local 249. For Local 30 was no reorganization of or successor to Local 249. They were independent unions differing in membership and jurisdiction, each concerned with protecting its own prerogatives and advancing its own interests.
 
 
 9
 It is, of course, possible that a preexisting collective bargaining agreement may remain in effect or be assigned to a new union when a plant is moved. Indeed, a successor union may acquire the benefits and burdens of a predecessor's labor contract even without such removal. But these possibilities do not help us discover or analyze what happened in this case. They do not make the action of the parties here any less indicative of a new labor contract with a new and different union.
 
 
 10
 Local 30 raises one entirely different point. The union says that it should not be required to make whole employees Zito and Baurhenn, two of the seven persons discharged on March 3rd, because no charge or complaint was filed against the union by or in the interest of these two.
 
 
 11
 Zito and Baurhenn were among the seven employees who filed the present charges against Midwest, but only the other five charged Local 30 with causing Midwest to act as it did. Similarly, the complaint issued by the Board named all seven employees as wronged by Midwest, but named only five as victims of the union's unfair coercion. Nevertheless, the trial examiner found that Local 30 had caused the company to discriminate against all seven employees and recommended that the union, as well as the employer, be ordered to make all seven whole.
 
 
 12
 The general counsel, in his brief in support of the intermediate report, noted this variance between the complaint and the relief recommended against the union, but stated that this was in his view unobjectionable. Local 30 took no exception to the intermediate report and even now makes no claim that it could have produced any defense in the cases of Zito and Baurhenn. Indeed, the union does not contest the finding that all seven men were discharged on the same day for the same improper reason. It was not until six months after the Board's decision adopting the trial examiner's recommendations that Local 30 moved to have the Board rescind its back pay order as to Zito and Baurhenn. Then and now the only reason urged for such action was and is the failure of the complaint formally to name these men as victims of the union's wrongdoing. The Board denied the motion.
 
 
 13
 We think the Board's action was entirely justified. Throughout the administrative proceeding it was made clear that the unfair labor practice charged against Local 30 was its conduct in causing the employer to require all employees transferred to the new Irwin terminal to join Local 30 before March 3rd on penalty of discharge. It was this coercion which resulted in discrimination against all who were discharged for failure to join Local 30. With the wrong thus specified, the membership of the injured class was well defined and peculiarly within the knowledge of the union. When the trial examiner recommended that liability be imposed on the union to reimburse all seven of the discharged employees, the union was put on notice to challenge the propriety of such recommended relief before the Board and to assert any defense it had in the case of any of the seven. It failed to take such action. This, therefore, is an especially appropriate case for following the decisions in this and other circuits which have enforced orders awarding reinstatement and back pay to employees not named in a complaint but found to have been victims of unfair labor practices described in the complaint and proved before the Board. Berkshire Knitting Mills v. N.L.R.B., 3 Cir., 1943, 139 F.2d 134, certiorari denied 1944, 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579; Republic Steel Corp. v. N.L.R.B., 3 Cir., 1939, 107 F.2d 472, modified as to another point 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; N.L.R.B. v. Knickerbocker Plastic Co., 9 Cir., 1955, 218 F.2d 917; Stewart Die Casting Corp. v. N.L.R.B., 7 Cir., 1940, 114 F.2d 849, certiorari denied 1941, 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119.
 
 
 14
 We are satisfied that the Board's decision is in all respects proper. The order of the Board will be enforced.
 
 
 
 [1]
 In view of our disposition of the case we need not inquire into 'the effective date' of the agreement between Midwest and Local 30. If we had inquired and found that date to be later than February 10, 1958, then, of course, these employees would have been protected from discriminatory discharge by the alternative condition in the proviso to Section 8(a)(3) for the thirty days following such later date